UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

TUCKSON GARNES,

                             Plaintiff,

        v.

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

**MEMORANDUM AND ORDER**

18-CV-5656 (LDH)

---

LaSHANN DeARCY HALL, United States District Judge:

      Plaintiff Tuckson Garnes, proceeding pro se, appeals the denial by Defendant Commissioner of Social Security (the "Commissioner") of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). The Commissioner moves pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings.

## BACKGROUND[1]

### I.    Plaintiff's DIB Application

      Plaintiff applied for DIB on January 13, 2015, alleging disability since April 28, 2014, due to bursitis and diabetes. (Tr. 122–125, 151, ECF No. 7.) After his application was denied, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 61–72.) The hearing was held on July 26, 2017. (Tr. 28–59.) At the hearing, the ALJ advised Plaintiff of his right to a lawyer, and Plaintiff elected to proceed without one. (Tr. 32–34.) The ALJ heard testimony from Plaintiff and a vocational expert. (Tr. 30–59.) On September 25, 2017, the ALJ issued a decision finding that Plaintiff was not disabled through the date he was last insured:

---

[1] The following facts are taken from the administrative transcript, cited in this opinion as "Tr." (ECF No. 7.)

June 30, 2016. (Tr. 18–24.) On August 30, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–4.)

## II.    Non-Medical Evidence

Plaintiff was born in 1950. (Tr. 122.) From approximately 2000 until approximately 2004, he worked as a survey representative for a marketing company. (Tr. 152.) For three months in 2006, he worked as a cleaner for a cleaning service. (*Id.*) From December 2007 to April 28, 2014, he worked as a telemarking salesperson for a cable provider. (*Id.*) Plaintiff's role with the cable provider ended when his division was eliminated. (Tr. 36–39.) He interviewed for a new job, which he stated he did not receive because his credit rating was too low. (Tr. 36.)

At his hearing on July 26, 2017, Plaintiff stated that he was divorced and lived alone. (Tr. 35.) He testified that he prepared his own meals; performed some household chores; made his own bed; and did not require a housekeeper because he was "pretty efficient with short little things around the house." (Tr. 49–51.) Plaintiff testified that he could stand for 30 minutes and could lift up to 10 pounds. (Tr. 50.) In fact, he testified that he had helped his son move into a building with an elevator. (*Id.*) When asked about his impairments at the hearing, Plaintiff reported that he had four herniated discs in his back and a bad right hip. (Tr. 43.) Plaintiff stated that his treatment included monthly follow up with a pain specialist, physical therapy, and prescription medications. (Tr. 43–48.) He took the bus to his medical appointments and was planning to get a driver's license. (Tr. 52.) Plaintiff indicated that he had been able to work despite his pain and injuries for years. (Tr. 34). According to his testimony, he stopped working because his job was eliminated, not because of his disability. (Tr. 36, 38). He testified that his pain, however, prevented him from being able to stand up after sitting for a long period, and he

2

has difficulty climbing stairs, cannot kneel for too long and can never squat. (Tr. 165.) Furthermore, cold weather increases his pain. (Tr. 44.)

Vocational expert Molly Meloy Kelly also testified at Plaintiff's hearing. (Tr. 53–58; *see also* Tr. 216–19.) She testified that Plaintiff's past work included a sedentary, semiskilled job as a telephone salesperson, and a light, unskilled job as a housekeeper/cleaner. (Tr. 56.) The ALJ asked the vocational expert a series of hypothetical questions that reflected Plaintiff's vocational profile and a capacity to perform light work with the need to change positions for up to five minutes every 60-minutes and a restriction to no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 57.) In response, the vocational expert testified that Plaintiff could perform his past work as a telephone salesperson and housekeeper/cleaner, as actually performed and generally performed in the national economy. (*Id.*)

### III.  Medical Evidence

The medical evidence in the record primarily consists of: (1) a medical opinion from Plaintiff's podiatrist, Steven Ginsberg, DPM; (2) an opinion from a consultative examiner, Joyce Graber, M.D.; and (3) treatment records from Plaintiff's treating physician, Dmitry Fuzaylov, M.D., who specializes in physical medicine, and rehabilitation and pain medicine.

On January 21, 2015, Dr. Ginsberg completed a disability questionnaire for the New York State Office of Temporary and Disability Assistance, in which he indicated that he had seen Plaintiff once—on October 7, 2014. (Tr. 347–48.) Dr. Ginsberg opined that Plaintiff's conditions of diabetic neuropathy, onychomycosis (nail fungus), and keratoma (callus) did not cause any functional limitations, including any limitations in standing, walking, sitting, pushing, or pulling. (Tr. 347, 350–51.)

On March 2, 2015, Plaintiff underwent a consultative internal medicine examination with Dr. Graber. (Tr. 359.) Plaintiff's self-reported daily activities included cooking, performing light household chores, shopping weekly, watching television, listening to the radio, going out to Chelsea Piers and the Staten Island Ferry in nice weather, and socializing with friends. (Tr. 359–60.) Physical examination revealed: normal gait and station; full ability to squat and walk on heels and toes; and no difficulty getting dressed, on or off the examination table, or rising from a chair. (Tr. 360.) Plaintiff had: full muscle strength in his upper and lower extremities; normal heart and lung sounds; full ranges of motion in all joints, spine, and extremities; negative straight leg raising; intact neurological functioning; no muscle atrophy in the extremities; and unhindered bilateral upper extremity dexterity and grip strength. (Tr. 361.) While the lumbar spine x-rays revealed some degenerative changes, Dr. Graber opined that Plaintiff had "no physical limitations." (Tr. 361, 363.) On May 18, 2015, an MRI scan of Plaintiff's lumbar spine revealed bulging discs at L2-3, L3-4, and L4-5 deforming the thecal sac, and bilateral L2, L3, L4, and L5 nerve roots. (Tr. 365.) The MRI also showed loss of normal disc signal intensity and height, and hypertrophic changes. (Tr. 365, 390.)

On April 22, 2016, Plaintiff visited Dr. Fuzaylov to establish care for complaints of lower back pain. (Tr. 380.) At his first appointment, Plaintiff—who used a cane—reported that he had been experiencing back pain for many years. (Tr. 380–81.) While he had not had any recent physical therapy, in the past, physical therapy had resulted in positive improvement in pain. (Tr. 380.) He reported no side effects of his medication. (*Id*.) The physical examination revealed some reduced sensation over the left lower extremity; diminished gait; diminished range of motion in the lumbar spine; tenderness in the lumbar paraspinals; and negative straight leg

4

raising bilaterally. (Tr. 380.) Dr. Fuzaylov prescribed physical therapy and medication. (Tr. 380–81.)

At his next appointment with Dr. Fuzaylov on May 13, 2016, according to the treatment notes, Plaintiff reported that the pain, which was gradual in onset and daily in frequency, was 50-60% controlled on medication. (Tr. 379.) Plaintiff still used a cane as an assistive device. (*Id.*) Dr. Fuzaylov prescribed oxycodone, and Mobic, and recommended physical therapy for eight weeks. (*Id.*) Plaintiff returned to Dr. Fuzaylov in June after he had started physical therapy, and was no longer using the cane. (Tr. 378.) Dr. Fuzaylov continued Plaintiff's treatment regimen of medication and physical therapy. (*Id.*)

On July 1, 2016, while Plaintiff still complained of lower back pain and left hip pain, he reported that difficulty walking had improved, his pain frequency had decreased from daily to some days of the week and physical therapy had been helpful. (Tr. 377.) A physical examination revealed improved gait, no need for a cane for ambulation, improved lumbar range of motion, and improved tenderness. (*Id.*) Dr. Fuzaylov recommended continued oxycodone, discontinuing physical therapy after the next visit, and a hip injection if the pain worsened. (*Id.*)

Plaintiff had a follow-up appointment with Dr. Fuzaylov on July 29, 2016. (Tr. 376.) Two weeks of jury duty had increased the pain in his right hip and decreased right hip range of motion. (*Id.*) While Plaintiff reported that walking, standing, and driving were aggravating factors, his medication had no side effects and improved his ability to ambulate, stand, and tolerate social situations. (*Id.*) Upon examination, Plaintiff had weakness in the right hip and the right knee. (*Id.*) Dr. Fuzaylov discontinued physical therapy and administered a right hip injection. (Tr. 375–376.) When Plaintiff returned on September 1, 2016 for a follow up, he reported a 70% improvement in his hip pain. (Tr. 374.)

5

On September 22, 2016, Dr. Fuzaylov decreased Plaintiff's oxycodone, recommended that Plaintiff resume physical therapy and administered a lumbar spine injection. (Tr. 373–74.) Subsequently, on September 30, 2016, Plaintiff returned to Dr. Fuzaylov and reported a 60% improvement in back pain following the lumbar spine injection. (Tr. 372.) While, Plaintiff's overall gait and tenderness in the lumbar paraspinals had improved, he still had some hip tenderness. (*Id.*)

At Plaintiff's October 28, 2016 appointment, he reported to Dr. Fuzaylov that he was doing well with oxycodone, though he had to take an extra pill after prolonged walking or with cold-weather changes. (Tr. 369.) He stated that his medication reduced his pain by 50% and produced no side effects. (*Id.*) Plaintiff reported that he still experienced lower back and bilateral hip pain, but was generally better since the injection one month prior. (*Id.*) Dr. Fuzaylov renewed Plaintiff's Mobic and oxycodone prescriptions and discussed a home-exercise program. (Tr. 369.)

Upon return to Dr. Fuzaylov on November 29, 2016, Plaintiff reported acute worsening of lower back and bilateral hip pain, aggravated by bending forward, lifting, standing, and walking. (Tr. 371.) The pain affected his ability to ambulate and perform activities of daily living. (*Id.*) His pain was relieved by rest, medication, and physical therapy. (*Id.*) Dr. Fuzaylov recommended physical therapy two to three times per week for eight weeks, and discussed home exercises. (*Id.*) Plaintiff returned to Dr. Fuzaylov on December 27, 2016. (Tr. 367.) Plaintiff had been going to physical therapy and reported a 50% improvement in walking and bending forward. (*Id.*) Plaintiff reported lower back pain and bilateral hip pain aggravated by walking and standing. (*Id.*) Upon examination, Plaintiff had weakness in his hips and mildly antalgic gait, with stumbling features and decrease in stride. (*Id.*) Plaintiff had improved range

6

of motion in the lumbar spine, decreased range of motion in the hips, tenderness over the lumbar paraspinals, and positive straight leg raising on the left. (*Id.*)  Dr. Fuzaylov recommended continued physical therapy and medication. (*Id.*)

## STANDARD OF REVIEW

Under the Act, a disability claimant may seek judicial review of the Commissioner's decision to deny his application for benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594, at *8 (E.D.N.Y. Sept. 11, 2012).  In conducting such a review, the Court is tasked only with determining whether the Commissioner's decision is based upon correct legal standards and supported by substantial evidence. 42 U.S.C. § 405(g); *see also Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)).  The substantial-evidence standard does not require that the Commissioner's decision be supported by a preponderance of the evidence. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982) ("[A] factual issue in a benefits proceeding need not be resolved in accordance with the preponderance of the evidence . . . .").  Instead, the Commissioner's decision need only be supported by "more than a mere scintilla" of evidence and by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In deciding whether substantial evidence supports the Commissioner's findings, a court must examine the entire record and consider all evidence that could either support or contradict the Commissioner's determination. *See Jones ex rel. T.J. v. Astrue*, No. 07-cv-4886, 2010 WL 1049283, at *4 (E.D.N.Y. Mar. 17, 2010) (citing *Snell v. Apfel*, 171 F.3d 128, 132 (2d Cir. 1999)), *aff'd sub nom.*, *Jones ex rel. Jones v. Comm'r of Soc. Sec.*, 432 F. App'x 23 (2d Cir. 2011) (summary order).  Still, a court must defer to the Commissioner's conclusions regarding

7

the weight of conflicting evidence. *See Cage v. Comm'r of Social Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)). If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed. *Ortiz v. Comm'r of Soc. Sec.*, No. 15-CV-3966, 2016 WL 3264162, at *3 (E.D.N.Y. June 14, 2016) (citing 42 U.S.C. § 405(g)). Indeed, if supported by substantial evidence, the Commissioner's findings must be sustained, even if substantial evidence could support a contrary conclusion or where a court's independent analysis might differ from the Commissioner's. *See Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)); *Anderson v. Sullivan*, 725 F. Supp. 704, 706 (W.D.N.Y. 1989); *Spena v. Heckler*, 587 F. Supp. 1279, 1282 (S.D.N.Y. 1984).

## DISCUSSION

To be eligible for disability benefits under 42 U.S.C. § 423, a claimant must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months," and the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). Additionally, "an applicant must be 'insured for disability insurance benefits'" at the time of his disability onset. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989); 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1)).

The Commissioner's regulations prescribe the following five-step framework for evaluating disability claims:

8

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him per se disabled. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation and internal modifications omitted); *see also* 20 C.F.R. §§ 404.1520(a), 416.920(a).

At step one, the ALJ correctly determined that Plaintiff had not engaged in substantial gainful activity between his alleged disability-onset date of April 28, 2014, and the date he was last insured, June 30, 2016. (Tr. 20.)

At step two, the ALJ's determination that, through the date he was last insured, Plaintiff had the severe impairments of bilateral hip osteoarthritis, lumbar degenerative disc disease, and obesity is supported by the record. (Tr. 20.) The ALJ's finding that Plaintiff's hammertoes, keratoma and diabetic neuropathy were non-severe impairments is also supported by the record. (Tr. 20–21.) Plaintiff did not allege disability or limitations from his non-severe impairments in his DIB application or at his hearing. (*See* Tr. 30–53, 151.) Furthermore, Plaintiff's podiatrist—while he diagnosed these conditions—did not find that these conditions caused any functional limitations. (Tr. 350–51.) This was confirmed by the consultative examination, which did not find any physical limitations. (Tr. 361–62.)

At step three, the ALJ determined that, through the date Plaintiff was last insured, his impairments, alone or in combination, did not meet or medically exceed the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21.) With respect to

9

disorders of the musculoskeletal system, the ALJ looked to Listing 1.02. (Tr. 21.) Listing 1.02 regards disability due to major dysfunction of a joint. Relevant here, it is characterized by "gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s), [w]ith involvement of one major peripheral weight-bearing joint . . ., resulting in inability to ambulate effectively." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02B. The regulations define ineffective ambulation as "an extreme limitation of the ability to walk . . . generally [marked by] insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* at 1.00B (2)(b)(1).

There is substantial evidence to support the finding that Plaintiff did not demonstrate an inability to ambulate effectively. (Tr. 21.) Plaintiff's consultative examination showed: normal gait and station; full ability to squat and walk on heels and toes without any assistive devices; full range of motion in all joints; negative straight leg raising; and no muscular atrophy in the extremities. (Tr. 361.) Furthermore, Plaintiff's treatment records with Dr. Fuzaylov showed an intact to mildly antalgic gait with only an occasional use of a cane, and normal range of motion in the extremities with no misalignment or instability. (Tr. 376–80.) Additionally, Plaintiff reported he could walk, perform housework, take public transportation, and go sightseeing. (Tr. 21, 49–51, 359–60.). *See Polynice v. Colvin*, 576 F. App'x 28, 29 (2d Cir. 2014) (summary order) (finding substantial evidentiary support for the ALJ's determination that the claimant did not establish inability to ambulate effectively where "[t]he consultative examiner's findings

10

failed to indicate gait abnormalities, and [the claimant] maintained a lifestyle that included performance of household chores and attendance at church and college").

The ALJ also properly found that Plaintiff did not satisfy the criteria for Listing 1.04 for disorder of the spine. (Tr. 21.) With respect to Plaintiff's nerve root compression, the ALJ looked to Listing 1.04. (Tr. 21.) Listing 1.04 regards disability due to disorders of the spine—characterized by compromise of a nerve root or the spinal cord—with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04. The ALJ found that Plaintiff's MRI of the lumbar spine dated May 18, 2015 showed degenerative changes but no nerve root compression. (Tr. 21.) Indeed, while his scan revealed deformities, bulging discs, some loss of disc height, and hypertrophic changes, Plaintiff's physical examination conducted several months earlier by the consultative examiner showed none of the indicators of nerve root compression as described in § 1.04(A). (*See* Tr. 360–61, 363, 365.) Thus, there is substantial evidence in the record to support the finding that Plaintiff is not considered per se disabled.

At step four, the ALJ's determination that Plaintiff retained the residual functional capacity ("RFC") to perform his past sedentary work as a telephone salesperson and past light work as a housekeeper/cleaner is supported by substantial evidence in the record. (Tr. 22–24.) Specifically, the ALJ's RFC determination is supported by the medical opinions of Dr. Ginsberg, Plaintiff's podiatrist, and Dr. Graber, Plaintiff's consultative examiner; the treatment records from Dr. Fuzaylov, Plaintiff's treating physician; and Plaintiff's own testimony. Dr. Ginsberg and Dr. Graber both stated that Plaintiff had no limitations. (Tr. 350-51, 361, 363.) The ALJ gave great weight to Dr. Ginsberg's opinion as it related to podiatric impairments. (Tr. 23.) The ALJ gave some weight to Dr. Graber's opinion because the ALJ looked at subsequent treatment

11

records from Dr. Fuzaylov and found that Plaintiff did some have limitations. (Tr. 24.) Specifically, while Plaintiff had limited range of motion of his spine, and issues with muscle weakness and gait, (Tr. 376–81), Plaintiff showed improvements in his conditions with physical therapy, shots of medication, and oral pain management medication.[2] (*See, e.g.,* Tr. 376–377.) The ALJ weighed these medical findings in light of Plaintiff's own testimony, in which he indicated that despite his pain, he had been able to work for years, and that he stopped working because his job was eliminated, not because of his disability. (Tr. 34, 36, 38.) Plaintiff further testified that he was able to handle household chores and activities of daily living, lift up to 10 pounds, help his son move into an elevator building, and run errands such as walking three long blocks to the grocery store. (Tr. 49–51.) The ALJ thus properly found that the "substantial evidence of routine activities," was inconsistent with Plaintiff's claims of total disability. *Lamorey v. Barnhart*, 158 F. App'x 361, 363 (2d Cir. 2006) (summary order); *see also* 20 C.F.R. § 404.1529(c)(3)(i).

The ALJ's determination that Plaintiff could perform his past work as a telephone salesperson and housekeeper/cleaner is supported by the vocational expert's classification of such position as sedentary and light respectively. (Tr. 24, 45, 56–58.) Specifically, the vocational expert testified that a person with Plaintiff's age and education, who could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for a total of 6 hours in a workday and sit for 6 hours in a workday, and occasionally climb, balance, stoop, kneel, crouch and crawl could perform his previous work. (Tr. 57.) A hypothetical limitation of having to

---

[2] Plaintiff argues in his brief that he suffers from side effects of his medication, including drowsiness, which make him unable to drive, use a computer, talk to clients or be an asset to a business. (Pl.'s Mem. Law Supp. Pro Se Pl. Mot. J. ("Pl.'s Mem.") 3, ECF No. 17.) Plaintiff consistently reported to Dr. Fuzaylov, however, that his medication had no side effects. (Tr. 378–380.) Therefore, there is substantial evidence to support the ALJ's finding that his medication was not disabling.

12

change positions for up to five minutes every sixty minutes did not change the vocational expert's conclusion. (Tr. 57.) This was not error.[3] *See Heagney-O'Hara v. Comm'r of Soc. Sec.*, 646 F. App'x 123, 127 (2d Cir. 2016) (summary order) (finding ALJ's step-four analysis supported in part by vocational expert's testimony).

Having found that Plaintiff was capable of performing his past relevant work as a telephone salesman and housekeeper/cleaner, the ALJ was not required to proceed to step five.[4] 20 C.F.R. § 404.1520(f) ("[W]e will compare our residual functional capacity assessment . . . with the physical and mental demands of your past relevant work. . . . If you can still do this kind of work, we will find that you are not disabled.").

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is GRANTED, and the final decision of the Commissioner is affirmed.

SO ORDERED.

Dated: Brooklyn, New York  
      March 31, 2020

/s/ LDH  
LASHANN DEARCY HALL  
United States District Judge

---

[3] The ALJ found that Plaintiff had the RFC to perform light work, with the same modifications as posed to the vocational expert, except there appears to be an obvious typo in the opinion. The opinion states that "Claimant can lift and carry ***10 pounds occasionally*** and ***20 pounds frequently***." (Tr. 22 (emphasis added).) Of course, it is illogical that an individual could lift higher weights more frequently than lower weights, and thus, this appears to be a typo. The correct hypothetical, however, was posed to the vocational expert in determining whether Plaintiff could perform his past work. (*See* Tr. 57 (RFC hypothetical posed to vocational expert stated that the individual could life and carry ***"20 pounds occasionally"*** and ***"10 pounds frequently"***) (emphasis added).) The typo does not prevent the Court from finding that substantial evidence supporting the ALJ's finding that Plaintiff can perform his past work. *See McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (Any hypothetical posed to a vocational expert must "accurately reflect the limitations and capabilities of the claimant involved.").

[4] Plaintiff's argument that the Court should find him disabled because the Department of Education discharged his student debt on account of his disability is unavailing. (Pl.'s Mem. 2.) A determination of disability under a different agency's standards is not evidence of disability for the purposes of Social Security. *See* 20 C.F.R. § 404.1504 ("a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled ... is not binding on" the Commissioner); *see also Ramirez v. Astrue*, 12-cv-6221, 2014 WL 2520914, at *10 (W.D.N.Y. Mar. 28, 2014) (noting that disability opinions under New York Workers' Compensation law are entitled to little weight in the Social Security context because the laws governing each system differ).